FILED

06/06/2017

Clerk of the
Appellate Courts


# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 19, 2017

## JOHN WILLIE STONE v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bedford County**
**No. 18042    F. Lee Russell, Judge**

_____

## No. M2016-01269-CCA-R3-PC

_____

A Bedford County Circuit Court jury convicted the defendant, John Willie Stone, of burglary of an automobile, theft of property valued at $500 or less, and aggravated assault, and the trial court imposed a total effective sentence of 21 years' incarceration. Shortly after the conclusion of his trial and prior to the entry of his judgments or his sentencing hearing, the defendant filed a pro se motion seeking new counsel, which the trial court interpreted as a petition for post-conviction relief on the basis of ineffective assistance of counsel. Following a combined hearing on the defendant's motion for new trial and his purported petition for post-conviction relief, the trial court denied all claims. In this appeal, the defendant challenges both the sufficiency of the convicting evidence and the length of his sentence in addition to the ineffectiveness of his trial counsel. Because the trial court erroneously treated the defendant's motion for new counsel as a petition for post-conviction relief, we vacate the portion of the trial court's judgment which denied post-conviction relief to the defendant. In all other respects, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed in Part;**
**Vacated in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Wesley Hall, Unionville, Tennessee, for the appellant, John Willie Stone.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Robert J. Carter, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In April 2015, the Bedford County Grand Jury charged the defendant with one count each of burglary of an automobile, theft of property valued at $500 or less, and aggravated assault. The trial court conducted a jury trial in October 2015.

The State's proof at trial showed that on the night of August 26, 2014, Caitlin Pope drove her truck to her parents' residence on East Franklin Street in Shelbyville. She arrived at approximately 9:30 p.m. and parked in front of the house. Ms. Pope left the vehicle unlocked with the windows down, and she placed her wallet in a cup holder between the two front seats of the vehicle while she went inside the house.

Andrew Joel Doak testified that his parents lived next door to Ms. Pope's parents and that on the night of August 26, he had driven to his parents' house to pick up some food. As he was walking to his vehicle which was parked on Franklin Street, he noticed "some legs hanging out a driver's side vehicle next door." Finding this suspicious, Mr. Doak approached the vehicle, and the man, who was "hanging out of the driver's side window" and who was later identified as the defendant, jumped to the ground and began to walk away. Mr. Doak followed the defendant and noticed that he "st[uck] something under his shirt and down in his pockets." Due to the darkness and the fact that the defendant was wearing a hat, Mr. Doak was initially unable to discern much about his appearance.

After Mr. Doak had followed the defendant a short distance, the defendant suddenly turned and "threw his hands" up, asking Mr. Doak, "What's up?" Mr. Doak inquired what the defendant was doing, and the defendant responded that he wasn't "doing nothing." Mr. Doak then accused the defendant of breaking into the truck, which the defendant denied. The defendant then began to run. Mr. Doak gave chase, and the defendant reached under his shirt and told Mr. Doak, "Don't make me pull this on you." The defendant "darted away," and Mr. Doak attempted to round a tree and cut him off when the defendant tripped and fell to the ground. The defendant immediately jumped to his feet and lunged at Mr. Doak; Mr. Doak was "really scared," and his only thought was "don't let him get close enough if he does have" a weapon. To keep the defendant at bay, Mr. Doak kicked him in the head, but the defendant managed to stay on his feet. Mr. Doak and the defendant continued to scuffle, during which Mr. Doak saw "something get throwed [sic] out from under [the defendant's] shirt." Eventually, Mr. Doak gained control of the defendant and held him on the ground while Mr. Doak called 9-1-1. While Mr. Doak was speaking with the 9-1-1 dispatcher, he felt something hit his arm. Mr. Doak noticed that his right forearm had been cut near his elbow, and he saw "the blade . . . coming at [his] arm again." Mr. Doak informed the dispatcher that the defendant had a knife, and he tossed his telephone aside so that he could concentrate on disarming the

defendant. Mr. Doak was afraid of being stabbed. The defendant continued to struggle, and Mr. Doak ultimately took control of the knife and cast it away, all the while keeping the defendant pinned to the ground. Shelbyville Police Department ("SPD") officers arrived a short time later.

When SPD Lieutenant Mike Baker arrived at the scene, he recognized the defendant "immediately." Fellow SPD Officer Chris Vest handcuffed the defendant and placed him in his patrol car, and Mr. Doak assisted Lieutenant Baker in locating the folding knife and Ms. Pope's wallet, both of which were a few feet from the area where Mr. Doak had pinned the defendant to the ground. Officer Vest photographed the injury to Mr. Doak's arm, which photograph was admitted into evidence along with photographs of Ms. Pope's wallet and folding knife.

Lieutenant Baker acknowledged that the defendant had a "visible injury" to his head, and Officer Vest recalled that the defendant had a "small cut" on the inside of his thumb.

Just as Ms. Pope was preparing to leave 15 to 20 minutes after arriving at her parents' house, Mr. Doak arrived at the front door and handed Ms. Pope her wallet. Ms. Pope verified that the contents of her wallet – a driver's license and two debit cards – were still there, but she noticed that the wallet "was smashed up." Ms. Pope confirmed that the value of her wallet and its contents were worth less than $500, and she denied knowing the defendant or giving him permission to enter her vehicle and take her property. Sometime later, Ms. Pope realized that a folding knife she kept in her truck was missing. At trial, Ms. Pope identified the knife recovered from the crime scene as her own.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, the defendant elected to testify.

The defendant testified that he was walking home on the night of August 26 when he realized that Mr. Doak was following him on Franklin Street. The defendant asked Mr. Doak what he was doing, and Mr. Doak "just hauled off and . . . hit [him] with something," striking him in his left eye. The defendant clarified that Mr. Doak, prior to striking him, had asked "what [the defendant] was doing in a vehicle or something." The defendant denied any involvement with a vehicle that night or even seeing a vehicle before being attacked by Mr. Doak.

The defendant said that Mr. Doak continued to hit him throughout their scuffle, causing the defendant to be "[v]ery dazed" and "confused." Because Mr. Doak

- 3 -

was choking him, he was concerned that Mr. Doak would kill him, and he was unable to move freely. The defendant denied having a knife but agreed that he had sustained a cut to his right thumb.

On cross-examination, the defendant stated that Mr. Doak had a knife, which he produced shortly after encountering the defendant, and the defendant insisted that he sustained the cut to his thumb when he attempted to block the knife thrust. The defendant was unsure which hand Mr. Doak used to hold the knife, but he believed that Mr. Doak was holding the closed knife in his hand while hitting the defendant. The defendant was unsure when Mr. Doak managed to open the knife. When asked how the knife ended up on the ground a few feet from the scuffle, the defendant responded that he managed to shake the knife out of Mr. Doak's hand. The defendant stated that he attempted to tell Officer Vest his side of the story during the ride to the police station but that Officer Vest essentially told him that "he really didn't want to hear what [the defendant] had to say." The defendant adamantly denied breaking into Ms. Pope's vehicle and stealing her wallet and knife. The defendant opined that Mr. Doak "could have stole[n]" Ms. Pope's property and placed it at the crime scene.

On rebuttal for the State, Officer Vest testified that, during the brief, 60-second ride to the jail, the defendant never attempted to tell "his side of the story" and that, in fact, the defendant "never spoke to [Officer Vest] about anything that took place" that night.

Based on this evidence, the jury convicted the defendant as charged of one count each of burglary of an automobile, theft of property valued at $500 or less, and aggravated assault. Shortly after the conclusion of the trial, the defendant filed, pro se, a letter which the court interpreted to be a petition for post-conviction relief,[1] and on November 4, 2015, the court appointed counsel to represent the defendant in post-conviction proceedings. The following day, the defendant appeared before the trial court and voluntarily withdrew his petition, and the trial court memorialized the dismissal of the petition on November 5.

On December 2, 2015, the defendant filed, pro se, a "Motion for Appointment of Counsel," in which he claimed to have received ineffective assistance of trial counsel, outlining the ways in which he believed trial counsel had been ineffective and asking the court to appoint new counsel. The trial court reappointed post-conviction counsel to meet with the defendant and counsel him "about the wisdom of pursuing" a post-conviction claim prior to a hearing on the defendant's motion for new trial or a sentencing hearing. At the December 3 hearing on the defendant's motion, which the

---

[1] No copy of this letter appears in the record.

- 4 -

court again interpreted to be a "petition for postconviction," the defendant assured the court that he wished to pursue his post-conviction issues prior to the resolution of the underlying issues. Post-conviction counsel stated on the record his admonitions to the defendant:

> I have explained to him that I have a concern that if he is trying to, for lack of better terminology, fold into his motion for new trial, PC elements, those are going to be decided and he's going to [be] barred from bringing those up later in a petition for postconviction relief, somewhat undercutting his positions. I have explained I'll ardently argue whatever he asks me to argue, but nonetheless, he is proceeding in that direction . . . of folding in.

Because the defendant would not be dissuaded from his pursuit of ineffective assistance of counsel issues, the trial court postponed the date of his sentencing hearing to permit new counsel appropriate time for preparation. Following an April 2016 sentencing hearing, the trial court sentenced the defendant as a career offender to a term of 6 years' incarceration for the burglary of an automobile conviction, and the court imposed a 15-year sentence as a Range III, persistent offender for the aggravated assault conviction, to be served consecutively to one another. With respect to the misdemeanor theft conviction, the trial court sentenced the defendant to a term of 11 months and 29 days' incarceration, to be served concurrently with the other two convictions, for a total effective sentence of 21 years.

At the outset of the May hearing on the defendant's motion for new trial and purported petition for post-conviction relief, the court again cautioned the defendant about his choice to pursue post-conviction relief at that stage of the proceedings:

> The Court: Okay. Mr. Stone, ordinarily, in a motion for new trial, the subject matter is mistakes made by the judge, mistakes made by the General, and mistakes made by the jury, I guess. That's what you would ordinarily be complaining about in trying to get me to grant a new trial.
>
> Now, it's my understanding that you've expanded upon that a bit and you are going to be complaining about your former attorneys. Now, here's the problem, we have a separate procedure which is initiated by a petition where you're asking for post-conviction relief, and that comes along after the trial, after the sentencing hearing, after the motion

for new trial, and after appellate review has been exhausted, after your case has gone up to the Court of Criminal Appeals and sometimes beyond, okay?  And those are separate things you're entitled to as long as you file for them timely.

In this situation, it appears to me, at least, that part of what you want to do, or have Mr. Hall do, in your, on your motion for new trial is to raise questions about the competence of and performance of your former attorneys.

Well, the danger for you there is you may waive or give up, may very well waive or give up your right to raise these same issues in a petition for post-conviction relief by doing it too early or doing it early.  You may give it up for later purposes; you understand that?

[The defendant]:      Yes, sir.

The Court:    Understanding that, you still want Mr. Hall to raise those questions about your former attorneys?

[The defendant]:      Yes, sir, we've talked about it.

The Court:    Okay.  I – anything else anybody thinks we need to put on the record about that?  I don't know how I could be any plainer in all honesty.  Mr. Hall, you've discussed the same subject with him, I'm sure.

Mr. Hall:      We have discussed it verbally in person and he's made it very clear through a very clear and cogent letter he wrote outlining all of his points and – which was almost repeated verbatim in the motion.

The Court:    Okay.  All right.  All right.  I guess we're ready to hear from you then.

At the hearing, trial counsel testified that, although he could not recall whether he had provided the defendant with a copy of his discovery materials, he was certain that he had reviewed and discussed all discovery materials with the defendant. With respect to the indictment, counsel was certain that he had provided the defendant with a copy because it was "a matter of policy" in his office.  Trial counsel acknowledged

- 6 -

that the defendant had requested independent fingerprint analysis and deoxyribonucleic acid ("DNA") testing on the knife recovered from the crime scene, but counsel had declined, explaining that his investigation had revealed that the defendant, Mr. Doak, and at least one SPD officer had handled the knife, thus rendering such testing irrelevant.

Trial counsel recalled that the defendant had asked him to "do all [he] could" to have the assistant district attorney removed from the case on the basis that said attorney had represented the defendant 20 to 25 years prior while working for the public defender's office. Trial counsel had informed the defendant that no basis existed to seek the attorney's removal; that the prosecutor had "no hard feelings" or "vendetta" toward the defendant; and that the prosecutor had offered assurances that "he would deal with this case on the merits."

Trial counsel testified that there were "no surprises" in the defendant's case and that the defendant had not objected to the use of any witnesses at trial or expressed a desire for a different jury pool. Trial counsel did recall discussing with the prosecutor the fact that the defendant's was the jury pool's second criminal case but that only one of the twelve jurors in the defendant's trial had sat on the jury for the prior criminal case.

Trial counsel stated that he had discussed potential defenses with the defendant but explained that the defendant was "clear" and "unequivocal" that he was not the perpetrator of the crimes. Counsel had "no knowledge" of the defendant's allegation that he had been seen in a holding cell by two jurors during a break in the trial, but counsel stated that, from his knowledge, the defendant was never seen wearing handcuffs, shackles, or jail attire by any of the jurors.

Although the defendant had provided trial counsel with photographs depicting the injuries he had sustained during his scuffle with Mr. Doak, trial counsel decided against using the photographs at trial, believing that the testimony regarding the injuries portrayed them to be worse than they actually were. Counsel did not recall a discussion with the defendant regarding the requirement of a 45-day window between conviction and sentencing, but the trial court interjected that such a discussion was typically held in open court.

The defendant testified that trial counsel never provided him with any of his discovery materials and that this failure inured to his prejudice because he was unaware of all of the evidence that the State had against him. The defendant adamantly denied that he had been provided with his arrest warrant. The defendant stated that counsel failed to confer with him regarding their defense strategy or inform him of the witnesses who would be testifying against him, specifically Ms. Pope. The defendant believed that, had trial counsel sought DNA and fingerprint testing on the knife, the results would have

shown that Mr. Doak had possessed the knife and that the defendant's blood was on the knife.

With respect to the defendant's request to have the prosecutor removed from his case, the defendant stated that he believed the prosecutor's former representation of the defendant was a "conflict of interest," but when asked whether the prosecutor had any knowledge about the defendant that potentially could have been used against him at trial, the defendant responded, "No, not, not really." The defendant explained that he had requested a new jury because he felt that the jury who heard his case was "overworked" and "tired" and that "they just wanted to get an easy verdict, guilty." The defendant admitted, however, that he did not make his request to trial counsel concerning a new jury until after the trial had begun. The defendant recalled that, during a lunch break at trial, he was seated just outside the "cage" which housed other inmates and that two jurors saw him seated outside the cage when they walked past. After the break, the defendant reported this incident to trial counsel, but trial counsel "didn't really say much about it," and the trial continued.

The defendant testified that he had asked trial counsel to present to the jury the photographs of his injuries because he believed they "really would have proved that [he] was the one that was assaulted." The defendant conceded that he had not brought the photographs to court with him to admit into evidence.

With this evidence, the trial court denied both post-conviction relief and the defendant's motion for new trial, finding as follows:

> Number one, this [defendant] has been around the system for a very long time and knows very well how it worked. I, as I recall from the sentencing hearing, he's probably been getting felony convictions for about 29 years or so, but it's decades, whatever it is. So, he knows good and well that a victim is going to testify in virtually every case.
>
> As far as his sentence being excessive, be happy for you to take that up because he has an extraordinarily bad record and the sentence he received is fully justified by, by his record and the investigation report came in and that absolutely shows how bad his record was.
>
> We've, we've heard his explanation for why he thinks he was convicted and Mr. Doak was not charged. It's a nonsensical explanation but he's given it several times.

Didn't give it today. The proof was very strong against him. Mr. Doak was very persuasive. [The defendant] was no more persuasive at the trial than he has been today.

It is my belief that [the defendant] was perjuring himself when he said he didn't know that, who the victim was or that she was going to testify or he'd never seen a warrant. He would have been given a warrant at the front end. He clearly had a warrant the day he bound the case over to Grand Jury 'cause he signed it and it has her name on it. He signed on one side and her name is on the other side of that document. So, he knew very well.

There's no showing that but for knowing her exact name it would have, he would not have been convicted. In some ways, she was, with her limited testimony, she was incidental to the trial. She told us what the items were that were – it was her car, we know why she was over there. As, as I recall, she lived in the neighborhood and – but anyway, it's, who she was made no difference in the outcome of this case in my humble opinion.

The DNA evidence, we know there was a scuffle, we know they both handled the knife. He admitted he was there. The evidence was overwhelming he was there. The presence of or absence of his DNA or Mr. Doak's DNA, it was just irrelevant to the situation. The picture of the injuries, it was not contested about his injuries, so that made no difference whatsoever in the outcome of the case.

It appears to me that [trial counsel] met with him adequately, and that [trial counsel] was prepared, and that [the defendant] was prepared. We have a limited number of witnesses here. It is not a situation where there were surprise witnesses. There were two victims, a couple of officers. I mean, there's just no surprise to this. There's not a lot of preparation that can be done. You know, what's [the defendant] going to tell [trial counsel] that's going to add to his ability to impeach any of those people? None whatsoever.

As far as what [the prosecutor] did or didn't know, [the prosecutor] didn't have a conflict because he not only, there's no evidence that he had any information that would have compromised him but he didn't introduce it if he did. If he had all this information in his head, he didn't use it in front of that jury to get this man convicted. So, this, this idea of a conflict is just pure fiction. And was there insufficient evidence? The evidence was overwhelming, and not only was sufficient, it was overwhelming in this particular case.

The trial court memorialized its findings in an order, concluding that trial counsel's performance was not deficient and that the defendant had failed to prove that he was in any way prejudiced by trial counsel's representation.

Following this denial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the evidence was insufficient to support his convictions, that the sentence imposed was excessive, and that trial counsel's representation was deficient and prejudicial. We will address each issue in turn.

## I. Sufficieny

The defendant first contends that the evidence adduced at trial was insufficient to sustain his convictions. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"A person commits burglary who, without the effective consent of the property owner . . . [e]nters any . . . automobile, . . . or other motor vehicle with intent to commit a felony [or] theft . . . ." *Id.* § 39-14-402(a)(4). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103. Aggravated assault is an intentional or knowing "assault as defined in § 39-13-101(a)(1)" that is committed via the use or display of a deadly weapon. T.C.A. § 39-13-102(a)(1)(A)(iii). Assault, as is relevant to this case, occurs when one "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2). A deadly weapon includes "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(5)(B). Bodily injury "includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(a)(2).

In the instant case, the proof at trial established that Mr. Doak saw the defendant's legs hanging from the driver's side window of Ms. Pope's vehicle. After the defendant disentangled himself from the vehicle, Mr. Doak observed the defendant placing something underneath his shirt and into his pockets. During the ensuing scuffle, Mr. Doak saw something fall from the defendant's shirt onto the ground. While Mr. Doak was attempting to restrain the defendant, the defendant stabbed Mr. Doak in the forearm with a knife. Mr. Doak testified that he was "really scared" throughout his encounter with the defendant and that he was concerned that the defendant might stab him again. After police officers arrived on the scene and took the defendant into custody, Lieutenant Baker and Mr. Doak located Ms. Pope's wallet and folding knife on the ground near the scene of the scuffle. Ms. Pope identified both her wallet and knife for the jury and testified that the defendant did not have her permission to enter her vehicle or take her property.

Viewing all of this evidence in the light most favorable to the prosecution, we find that the evidence overwhelmingly supports the defendant's convictions of burglary of an automobile, misdemeanor theft, and aggravated assault.

## II. Sentencing

The defendant next contends that the sentences imposed for his burglary of an automobile and aggravated assault convictions were generally excessive. Again, we disagree.

Our standard of review of the trial court's sentencing determinations in this

case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

Our supreme court has held that the standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013).

Here, the record reflects that the trial court, in sentencing the defendant, considered all appropriate principles set forth in Code section 40-35-210(b). The court found no mitigating factors and two enhancement factors to be applicable: that the defendant had a prior history of criminal convictions in addition to those necessary to establish the appropriate range and a failure to comply with past conditions of release, noting that the defendant had an extensive criminal history spanning some 30 years and that he had five prior revocations of probation. *See* T.C.A. § 40-35-114(1), (8). The presentence investigation report established that the defendant had at least seven prior felony convictions in addition to multiple misdemeanor convictions. The court then sentenced the defendant as a career offender[2] with respect to his conviction of burglary of an automobile and as a Range III, persistent offender[3] with respect to his aggravated assault conviction, and the court imposed the maximum sentences of six years and 15 years, respectively, to be served consecutively to one another for a total effective

---

[2]     A career offender includes a defendant "who has received . . . [a]t least six (6) prior felony convictions of any classification if the defendant's conviction offense is a Class D or E felony." T.C.A. § 40-35-108(a)(3).

[3]     A persistent offender includes a defendant "who has received . . . [a]ny combination of five (5) or more prior felony convictions within the conviction class or higher or within the next two (2) lower felony classes, where applicable." T.C.A. § 40-35-107(a)(1).

sentence of 21 years. The court based its imposition of consecutive sentencing on the finding that the defendant had an extensive criminal record. *See* T.C.A. § 40-35-115(b)(2). The court also found that the defendant had "zero potential for rehabilitation," that confinement was necessary to protect society, and that measures less restrictive than confinement have frequently failed. *See* T.C.A. § 40-35-103.

Because the trial court considered all relevant principles associated with sentencing, no error attends the imposition of this within-range sentence.

### *III. Ineffective Assistance of Counsel*

Finally, the defendant reiterates his claim of ineffective assistance of counsel, claiming that trial counsel performed deficiently by failing to pursue DNA and fingerprint analysis of the knife; to seek the recusal of the prosecutor; to notify the defendant that Ms. Pope would be testifying against him; to request a new jury pool; to confer with and discuss defense strategies with the defendant; to seek a mistrial on the basis that jurors had seen the defendant seated outside of a prisoner holding cell; to use photographs of the defendant's injuries; and to provide the defendant with copies of his discovery, specifically his arrest warrant. The State contends that the court did not err by denying relief.

We must first address the trial court's treatment of this issue as one seeking post-conviction relief. Although prudence dictates that claims of ineffective assistance of counsel should be raised in a petition for post-conviction relief, *see State v. Mosley*, 200 S.W.3d 624, 629 (Tenn. Crim. App. 2005) ("The better practice is to make an ineffective assistance of counsel claim in a post-conviction proceeding."), nothing prevents a defendant from raising such a claim in the post-trial proceedings or on direct appeal. "This court has consistently 'warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant . . . amount of development and factfinding such an issue entails.'" *Id.* at 628-29 (quoting *Kendricks v. State*, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999)). Indeed, both the trial court and appellate counsel in the instant case strongly cautioned the defendant against his choice to pursue ineffectiveness claims at such an early stage in the proceedings. However, aside from his claims of trial counsel's ineffectiveness, nothing in the defendant's "Motion for Appointment of Counsel" suggests that it was intended to be a petition for post-conviction relief. To be sure, the term "post-conviction" or the like is not to be found within the defendant's five-page handwritten motion.

Under the Post-Conviction Procedure Act, petitions for post-conviction relief must comply with certain statutory rules:

(a) A post-conviction proceeding is commenced by filing, with the clerk of the court in which the conviction occurred, a written petition naming the State as the respondent. . . .

(b) The petitioner shall provide all information required by this section.  Petitions which are incomplete shall be filed by the clerk, but shall be completed as set forth in an order entered in accordance with § 40-30-106(d).

(c) The petition for post-conviction relief shall be limited to the assertion of claims for relief from the judgment or judgments entered in a single trial or proceeding. . . .

(d) The petitioner shall include all claims known to the petitioner for granting post-conviction relief and shall verify under oath that all the claims are included.

(e) The petitioner shall include allegations of fact supporting each claim for relief set forth in the petition and allegations of fact explaining why each ground for relief was not previously presented in any earlier proceeding.  The petition and any amended petition shall be verified under oath.  Affidavits, records or other evidence available to the petitioner supporting the allegations of the petition may be attached to it.

(f) The petitioner shall provide the name of any attorney licensed to practice law who drafts or has given assistance or advice regarding drafting the petition for post-conviction relief.

(g) Amendments to the petition shall conform substantially to the form for original petitions, except that matters alleged in the original petition need not be repeated.

*Id.* § 40-30-104.  A review of the defendant's "Motion for Appointment of Counsel" reveals that the motion did not comply with these requirements in multiple ways: the caption of the motion did not list the State as the respondent, *see* § 40-30-104(a); the judgments were not entered by the trial court until April 15, 2016, some four months *after* the filing of the defendant's motion, *see* § 40-30-104(c); the defendant's motion did not contain a verification under oath, *see* § 40-30-104(d), (e); appointed counsel filed a

- 14 -

"Motion for New Trial" listing all of the defendant's previously-claimed grounds of ineffective assistance of counsel, but counsel never filed an amended petition, *see* § 40-30-104(g); and finally, the trial court never ordered the defendant to file an amended petition pursuant to the requirement of Code section 40-30-106(d), *see* § 40-30-104(b). In short, the defendant's motion seeking new counsel and raising claims of ineffectiveness was simply that, and the trial court's decision to treat the motion as a petition for post-conviction relief was in error.

That the trial court treated the defendant's motion as a petition for post-conviction relief is particularly significant because it would have been his one and only bite at the proverbial post-conviction apple. "In no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment. If a prior petition has been filed which was resolved on the merits by a court of competent jurisdiction, any second or subsequent petition shall be summarily dismissed." T.C.A. § 40-30-102(c). Because we find that the underlying motion was *not* a petition for post-conviction relief, the defendant is still free to pursue post-conviction relief pursuant to the terms of the Post-Conviction Procedure Act, with the caveat that he has now exhausted any and all claims relative to the ineffectiveness of counsel, as will be discussed more fully herein.

Before a defendant will be granted relief on the basis of a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the defendant, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the defendant fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he defendant bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the defendant the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision

made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the lower court's factual findings, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In the instant case, the defendant, after reciting the applicable law for the review of ineffectiveness claims, merely listed his multiple claims of ineffective assistance of counsel in a 15-line, single sentence that was devoid of argument, citation to authorities, or appropriate references to the record. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. R. Ct. Crim. App. 10(b); *see also* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities . . . relied on"). Because the defendant failed to comply with these rules, he has waived our consideration of his ineffective assistance claims.

In any event, the record supports the ruling of the trial court. The lower court explicitly accredited the testimony of trial counsel and explicitly discredited that of the defendant. As such, we hold that the defendant has failed to prove by clear and convincing evidence any facts that demonstrate that trial counsel's representation was deficient or prejudicial.

### Conclusion

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE